UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHICAGO TITLE INSURANCE COMPANY, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | NO. 3:02-CV-1095 (CFD) |
| | : | |
| v. | : | |
| | : | |
| THE KENT SCHOOL CORPORATION, | : | |
| | : | |
| Defendant. | : | MAY 21, 2004 |

**DEFENDANT THE KENT SCHOOL CORPORATION'S MEMORANDUM IN OPPOSITION TO CHICAGO TITLE'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

The Defendant, The Kent School Corporation ("Kent School"), hereby submits this memorandum in opposition to the Motion for Summary Judgment filed by Chicago Title Insurance Company ("Chicago Title") on March 17, 2004 and in support of its own Cross-Motion for Summary Judgment, which accompanies this Memorandum.

The central issue in this litigation is the scope of Chicago Title's duty to defend Kent School pursuant to the terms of the title insurance policy which it issued to Kent School in 1966. The underlying claim against Kent School is a quiet title action brought by the Schaghticoke Tribal Nation first in 1975 and then revived in 1998. Chicago Title has provided a defense from 1977 through 2001 without reservation, question or purported tender.

Chicago Title raised a claim for the first time in late 2001 that it can terminate all of its responsibility for both defense and indemnity by simply tendering the indemnity amount of the policy, and that it can do so even after having provided a defense without reservation for some 24 years. The terms of the policy contradict Chicago Title's contention as a matter of law. Moreover, the evidence demonstrates that Chicago Title made no valid tender as a matter of fact.

Because valid tender is a predicate to Chicago Title's motion for summary judgment and because tender is a disputed issue of fact, Chicago Title's motion must be denied on that procedural basis alone. Further, Kent School's defense as to waiver and estoppel would require a factual determination, also precluding Chicago Title's motion for summary judgment.

The resolution of factual issues, however, is not necessary to Kent School's motion for summary judgment. Because Kent School is entitled as a matter of law to defense coverage by reason of the legal construction of the insurance policy in issue, its motion for summary judgment should be granted.

## FACTUAL BACKGROUND

Kent School is an independent, co-educational boarding school with approximately 550 students drawn from the United States and 19 other countries in grades 9 through 12, and is located in Kent, Connecticut. Affidavit of Thomas Sides at Paragraph 3. ("Sides Aff. at ¶ 3.") In 1966, Kent School acquired a parcel of real property to be incorporated into the School's campus. Sides Aff. at ¶ 7. In September of 1966, Chicago Title examined the title for the parcel, and sold to Kent School a corresponding title insurance policy insuring

the title of the newly acquired parcel. That policy provided for indemnity coverage for $100,000 and for the costs and expenses of defending the title. See Insuring Agreement on the first page of the Title Policy appended hereto as Exhibit 1.

In 1975, the Schaghticoke Tribal Nation sued Kent School and others in the United States District Court for the District of Connecticut, claiming that it had superior title to the insured parcel of land. Sides Aff. at ¶ 6. Kent School provided notice to Chicago Title, and Chicago Title provided a defense under the policy without reservation commencing in 1977. Sides Aff. at ¶ 8. In 1993, the court dismissed the Schaghticoke's claims without prejudice to a later revival of the suit. Affidavit of David Elliott, Esq. at Para. 5 ("Elliott Aff. at ¶ 5"). In June 1998, the Schaghticokes revived the suit. Id. at ¶ 6. Kent School again provided notice to Chicago Title; Elliott Aff. at ¶ 6; and again Chicago Title provided a defense. Affidavit of Eric Sussman at ¶ 6 ("Sussman Aff. at ¶ 6") and Exhibit 1 thereto. Chicago Title did not assert a reservation of rights. Elliott Aff. at ¶ 7.

In October 2001, after some 24 years, Chicago Title raised the issue of withdrawing from its defense obligations for the first time. Elliott Aff. at ¶ 8. In a telephone conversation with David Elliott (an attorney for Kent School in the defense of the Schaghticoke claim), Susan Woods, the Senior Vice President of Chicago Title, raised the potential of tendering the indemnity amount of the policy ($100,000). Id. After reviewing the terms of the policy as a whole, Kent School informed Chicago Title that the terms of the policy do not permit the withdrawal of the defense, and this lawsuit followed. Id. at ¶ 9 and Exhibits 2 and 3 thereto. Chicago Title has never actually tendered the $100,000. Id. at ¶

10. Moreover, even the described October 2001 communication was devoid of any reservation of rights.

## THE TERMS OF THE POLICY

The face sheet, titled "Policy of Title Insurance," contains the fundamental insuring agreement (hereinafter the "Insuring Agreement") which provides as follows:

> Chicago Title Insurance Company, in consideration of its charges for the examination of title and its premium for insurance, insures the within named insured against all loss or damage not exceeding the amount of insurance stated herein and in addition the costs and expenses of defending the title, estate or interest insured, which the insured shall sustain by reason of any defect or defects of title affecting the premises described in Schedule A . . . excepting all loss and damage by reason of the estates, interests, defects, objections, liens, incumbrances and other matters set forth in Schedule B, or by the conditions of this policy hereby incorporated into this contract, the loss and the amount to be ascertained in the manner provided in said conditions . . . .

Exhibit 1, Page 1 (emphasis added). Thus, the Insuring Agreement begins by recounting the fact that Chicago Title was responsible for examining the title for the property at issue prior to issuing the insurance policy. The presumed basis for Chicago Title undertaking the examination – for a fee – was to facilitate its determination to issue the title policy.

The Insuring Agreement then goes on to deal separately with "loss" or "damage" arising from a defect in title on the one hand, and the cost of defending the insured from such a defect on the other. The terms of the Insuring Agreement unambiguously state that Chicago Title will indemnify Kent School for an amount up to "the amount of insurance." The "amount of insurance" is defined on the declaration page of the policy to be $100,000. The terms of the Insuring Agreement further provide that Chicago Title will pay the "costs and expenses of defending the title" on behalf of Kent School. Moreover, the phrasing of

the policy demonstrates that the costs of defense are separate from and "in addition to" the indemnity portion of the policy. The costs of defense are not subject to the limit set by the "amount of insurance."

Section Two(a) of the portion of the policy titled Conditions of This Policy (hereinafter "Policy Conditions") is captioned "Defense and Prosecution of Suits," and consists of a simple declarative sentence:

> This company [Chicago Title] will, at its own cost, defend the insured in all actions or proceedings founded on a claim of title or incumbrances not excepted in this policy.

Exhibit 1, p. 5.

Notwithstanding the clarity of both the Insuring Agreement and Section Two(a), Chicago Title attempts to discard its defense obligations by incorrectly invoking Section Five(b) of the Policy Conditions captioned, "Payment of Loss." That section provides:

> In every case where claim is made for loss or damage this company (1) reserves the right to settle, at its own cost, any claim or suit which may involve liability under this policy; or (2) may terminate its liability hereunder by paying or tendering the full amount of this policy; . . ..

Exhibit 1, p. 5. The terms "loss" and "damage" are not defined in the policy but, based on the use of the terms within the context of the Insuring Agreement, they apply to the indemnity portion of the policy. Thus, claims for "loss" or "damage" would be made by the policyholder who has suffered an impairment of his title. In other words, the terms do not apply to a suit in which a third-party, like the Schaghticoke Tribal Nation, is seeking to assert a claim of superior title.

## ARGUMENT

### I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing the absence of any genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In this case, there are two competing Motions for Summary Judgment. With respect to Kent School's Motion, the dispute is over the meaning of the title insurance policy that was sold by Chicago Title to Kent School. The construction of the policy is a matter of law. E.g., Israel v. State Farm Mut. Auto. Ins. Co., 259 Conn. 503, 507 (2002). Since Kent School relies entirely on the language of the policy, there are no issues of material facts that are in dispute, and Kent School's Motion is ripe for decision.

However, Chicago Title's Motion involves more than the interpretation of the policy language. It also depends on Chicago Title's claim that it has tendered the "amount of insurance" under the policy. Chicago Title Memorandum at 5. Kent School disputes as a matter of fact that Chicago Title has ever tendered the amount of insurance.[1] Kent School also relies on the factual defenses of waiver and estoppel. Since all such facts are material to

---

[1] Kent School also disputes Chicago Title's interpretation of the policy as it relates to the amount that would need to be tendered. See discussion at pages 10-12, infra.

Chicago Title's claim, Chicago Title's Motion must be denied for this procedural reason alone.

## II. THE TERMS OF THE POLICY REQUIRE SUMMARY JUDGMENT IN FAVOR OF KENT SCHOOL

In the First Count of its Counterclaim, Kent School requests a declaratory judgment that the title insurance policy in issue here requires Chicago Title to pay all of Kent School's defense costs that have been or will be incurred in connection with the Schaghticoke suit.[2] Chicago Title cannot terminate its obligation by the payment of only the indemnity limits. The legal interpretation of the title policy itself warrants the entry of summary judgment in Kent School's favor on the First Count of its Counterclaim. Such a resolution would necessarily result in the entry of summary judgment against Chicago Title on all of its claims.

### A. THE RULES GOVERNING THE INTERPRETATION OF INSURANCE POLICIES

While there is relatively little reported law in Connecticut regarding the interpretation of title insurance policies, there is extensive law setting forth the fundamental principles of insurance contract construction. Those principles are directly applicable: "Generally in determining whether the insurer had an obligation to defend [under a title insurance policy],

---

2 Because these competing motions for summary judgment focus on the issue of Chicago Title's obligation to provide a defense through the ultimate resolution of the Schaghticoke litigation, Kent School's briefing has addressed this issue. Kent School, however, reserves the right to maintain in the future that Chicago Title's independent duty to defend extends beyond the Schaghticoke litigation and beyond the exhaustion of indemnity limits by settlement or judgment. See e.g., St. Paul Fire & Marine Ins. Co. v. Thompson, 433 P.2d 795 (Mont. 1967).

the courts have used the rules applicable in liability coverages." 9 Appleman, Insurance Law and Practice, Section 5215, p. 96 (1981).

The rules of insurance contract construction are well established in Connecticut. "The determinative question is the intent of the parties, that is, what coverage the [policyholder] expected to receive and what the [insurance company] was to provide, as disclosed by the provisions of the policy." Hertz Corp. v. Federal Ins. Co., 245 Conn. 374, 381 (1998)(internal citation omitted). Moreover, insurance policies in Connecticut are not to be interpreted from the viewpoint of an insurance underwriter or an attorney, but instead "will be construed as laymen would understand [them]." O'Brien v. United States Fid. & Guar. Co., 235 Conn. 837, 843 (1996)(internal citation omitted).

Finally, to the extent that the terms of the policy are ambiguous, those terms must be construed in favor of the policyholder, since the policy is a contract of adhesion. Indeed, to the extent that policy terms conflict, they are deemed ambiguous and are construed in favor of the policyholder. Imperial Cas. & Indem. Co. v. Connecticut, 246 Conn. 313, 325 (1998). The premise of this rule is that the insurance carrier, as the party who drafted the contract, "will presumably be guided by his own interests and goals in the transaction. He may choose shadings of expression, words more specific or more imprecise, according to the dictates of these interests. . . " Israel v. State Farm Mut. Auto. Ins. Co., 259 Conn. 503, 508-509 (2002), citing Hansen v. Ohio Cas. Ins. Co., 239 Conn. 537, 544 (1996).

**B. THE APPLICATION OF THE RULES OF POLICY CONSTRUCTION**

Here, the governing portions of the policy are clear. The Insuring Agreement[3] provides in relevant part:

> [Chicago Title] in consideration of the payment of its charges for the examination of title and its premium for insurance, insures [Kent School] against all loss or damage not exceeding the amount of insurance stated herein and in addition the costs and expenses of defending the title, estate or interest insured. . . (emphasis added).

Thus, the Insuring Agreement begins by reciting that Chicago Title did not merely accept a payment of a premium for insurance, but also examined the title that it insured. A part of the fee paid was for the examination of the title. Chicago Title took the fee, presumably conducted the examination that it deemed appropriate and accepted the risk of loss and defense. The risk has materialized, and Chicago Title now wants to walk away and leave its policyholder without a defense.

The insuring agreement then explicitly sets out the twin duties of indemnity and defense that Chicago Title agreed to undertake, and clearly indicates that the duty of defense is independent of that of indemnity. The Insuring Agreement does not set out any mechanism for the insurance carrier to avoid the costs of defense.

Similarly, Section Two(a) of the Policy Conditions, which is captioned "Defense and Prosecution of Suits," is clear and straightforward.

---

3 In its papers, Chicago Title attempts to minimize the importance of the Insuring Agreement by referring to it as the "Cover Sheet". See, e.g., Chicago Title Memorandum at pp. 4, 9. However, a simple reading of the policy in its entirety demonstrates that the so-called "Cover Sheet" defines the grant and the scope of the coverage. See Exhibit 1 hereto.

> The Company [Chicago Title] will, at its own cost, defend the insured in all actions or proceedings founded on a claim of title or incumbrances not excepted in this policy.

Thus, the portions of the policy that a layman would most likely understand as controlling the defense (the Insuring Agreement and the section captioned "Defense and Prosecution of Suits") both provide for a full defense, without any provision being made for the insurance carrier to abandon its obligations. As a result, the plain language of the policy requires that Chicago Title continue its defense.

In order to avoid the plain language of the Insuring Agreement and the Defense of Suits Provision, Chicago Title focuses on Section Five of the General Conditions. That Section of the Policy is captioned "Payment of Loss," and it provides in subsection (b):

> In every case where claim is made for loss or damages this company (1) reserves the right to settle, at its own cost, any claim or suit which may involve liability under the policy; or (2) may terminate its liability hereunder by paying or tendering the full amount of this policy;. . ..

However, Chicago Title's reading of Section Five(b) essentially reads Section Two(a) out of the agreement. This is impermissible since, as Chicago Title itself points out, each of the provisions of the policy "is to be given effect, if possible, and no word or clause eliminated as meaningless, or disregarded as inoperative, if any reasonable meaning consistent with the other parts of the policy can be given to it." Chicago Title Memorandum at Page 8 citing A.M. Larson Co. v. Lawlor Ins. Agency, 153 Conn. 618, 622 (1966).

### C. A CONSIDERATION OF THE ACTUAL POLICY LANGUAGE

The reading that Chicago Title is championing distorts the actual language of the policy in at least two fundamental respects. First, even Section Five (b)(2) does not say that Chicago Title can terminate all liability by tendering $100,000. Instead, that provision

requires the tendering of the "full amount of this policy." The $100,000 purportedly offered by Chicago Title is not the "full amount" of the policy, but rather it is the "amount of insurance." See Insuring Agreement and Declaration Page of the Policy attached hereto as Exhibit 1. The Insuring Agreement makes it clear that the "full amount of this policy" includes the $100,000 indemnity and, in addition, the costs of defense. Thus, if Chicago Title were to attempt to truly comply with Section Five (b)(2), it would have to tender the "full amount of this policy," which would include both the $100,000 indemnity and all of the defense costs incurred and to be incurred in defense of the Schaghticoke suit.

Presumably operating on the theory that the best defense is a good offense, Chicago Title claims that Kent School is seeking to read Section Five (b)(2) out of the policy. Chicago Title's difficulty, however, lies in the application of that theory, because Kent School's construction reconciles Section Five (b)(2) with the other more specific provisions of the policy. In doing so, Kent School simply limits the application of Section Five (b)(2) to its own terms. Chicago Title wishes this Court to read the term "full amount of this policy" as meaning the $100,000 in indemnity coverage. However, the "full amount of this policy" is not a defined term. Both the Insuring Agreement and the declaration page use the term "amount of insurance" to refer to the $100,000 in indemnity coverage. It is only logical that the use of a different term ("full amount of this policy") in Section Five (b)(2) must contemplate a different meaning. Moreover, it is also quite consistent with the policy's phrasing to interpret the "full amount of this policy" as the "amount of insurance" ($100,000) plus the "costs and expenses of defending the title" as set forth in the Insuring Agreement.

As a second aspect of the language analysis, by its very terms Section Five(b) only comes into play where a claim is made for "loss" or "damage." The Schaghticoke suit is not one for "loss" or "damage." Instead, the Schaghticoke suit claims that the Schaghticokes have superior title over Kent School. In other words, the Schaghticoke claim is "founded on a claim of title," and thus fits squarely within the unequivocal duty to defend as set out in Section Two(a) of the Policy Conditions. If the Schaghticokes prevail in their claim, then - and only then - would Kent School be making a claim for loss or damage as those terms are used in Section Five (b). Indeed, that very Section is captioned "Payment of Loss." See, generally, Section Five of the Policy Conditions, Exhibit 1, limiting the circumstances under which a claim for damages may be made. Because the Schaghticoke suit is not a claim for "loss" or "damage," Chicago Title's reliance on Section Five is entirely misplaced.

Finally, a reasonable and internally consistent construction of Section Five (b)(2) would allow Chicago Title to terminate its liability upon the payment of indemnity after a settlement or judgment. At that point, the defense component of the "full amount of this policy" would have been completed. See e.g., Samply v. Integrity Ins. Co., 476 So. 2d 79 (Ala. 1985), and Douglas v. Kelly, 727 N.E. 2d 376 (Ill. 2000), and the discussion at pages 22-23, infra.

Specifically, the Schaghticoke suit involves a claim to quiet title, which triggers the duty to defend under Section Two (a). Should the Schaghticokes prevail, Chicago Title would be liable, up to the amount of insurance under the policy. See Section Three (b)

(a claim for damages under the policy arises where "there has been a final determination adverse to the title, upon a lien or incumbrance not excepted in this policy.") At that point, Section Five(b) would apply, and Chicago Title would be within its rights to tender the "full amount of this policy". Since the underlying case would have concluded, the "full amount of this policy" would be equal to the "amount of insurance" and all costs of defense. Accordingly, the duty to defend provisions of the Insuring Agreement and Section Two(a) would apply unimpeded.

### D. A CONSIDERATION OF POSSIBLE POLICY LANGUAGE

The English language allows for a clear statement of Chicago Title's goal of terminating all of its liability upon a proper tender. Indeed, such language has been utilized in later iterations of the Chicago Title policy as illustrated by a comparison of the policy that Chicago Title sold to Kent School with the current standard Chicago Title policy form.

The 1966 Kent School policy was issued based upon a form prepared by the New York Board of Title Underwriters ("N.Y.B.T.U."). See Exhibit 1 (top left hand corner of first page). According to the deposition testimony of Chicago Title's underwriting designee, Philip J. Fanning, this N.Y.B.T.U. policy was considered more of a "provincial" policy. (Exhibit 2, Fanning Deposition, p. 77). Relevant portions of Fanning's deposition testimony are attached hereto as Exhibit 3.

In the 1970's, Chicago Title departed entirely from the N.Y.B.T.U. form and adopted the American Land Title Association ("ALTA") form of policy. Mr. Fanning characterized the ALTA policies as having a "national" scope. (Exhibit 4, Fanning

Deposition, p. 77). The current ALTA form bears a 10-17-92 revision date. Exhibit 8, Fanning Deposition, p. 76 and generally pp. 68-81, and Exhibit 2 attached hereto.

A comparison of the N.Y.B.T.U. form applicable here and the current ALTA form indicates that Chicago Title could have sold Kent School a policy that permits the tendering of the indemnity amount as a means of terminating liability, but that it failed to do so. Chicago Title contends that it has preserved its termination capability in the Kent School policy by burying it in a section captioned "Payment of Loss." However, as previously noted, the Kent School policy (N.Y.B.T.U. form) defines the amount of insurance as $100,000 and effectively defines the full amount of the policy as: "Amount of insurance and in addition the costs and expenses of defending the title." The Kent School policy arguably allows for the termination of Chicago Title's liabilities upon tendering the "full amount of this policy."

By comparison, Chicago Title's current ALTA policy proclaims its termination capability in a section entitled "Termination of Liability." Moreover, termination of liability under the current ALTA policy form does not require the tender of the "full amount of this policy," but only a tender of the amount of the insurance (e.g., $100,000) and the costs of attorneys' fees and expenses incurred up to the time of such tender. The current Chicago Title policy form is an ALTA form with a 10-17-92 revision date. Exhibit 8, Fanning Deposition, p. 76, and Exhibit 2 hereto. That form, if applicable, would have provided some predicate for Chicago Title's present effort to terminate its liability. Specifically, it provides:

> **6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY.**
>
> In case of a claim under this policy, the Company shall have the following additional options:
>
> **(a) To Pay or Tender Payment of the Amount of Insurance.**
>
> To pay or tender payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay.
>
> Upon the exercise by the Company of this option, all liability and obligations to the insured under this policy, other than to make the payment required, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, and the policy shall be surrendered to the Company for cancellation.

If the current ALTA form covered the Kent School policy and if Chicago Title had tendered the requisite amount, Chicago title could arguably have terminated its liability.[4] But that is not the case.

In view of the terms of the ALTA policy forms, [5] which have been the standard for Chicago Title over the past 30 years, it may not be surprising [6] that Chicago Title maintains that it can terminate its liability through a limited tender. The difficulty with that position, however, is that the ALTA form has no direct relevance to the Kent School policy. Indeed,

---

4 Absent waiver or estoppel.

5 A collection of the ALTA policy forms showing the evolution of this provision is appended as Exhibit 2. They include revisions dated October 17, 1970, October 17, 1984, October 21, 1987, April 6, 1990 and October 17, 1992. The forms were authenticated as business records at the deposition of Phillip Fanning, pp. 88-89.

6 Indeed, the Chicago title designated a Rule 30(b)(6) witness, Attorney Susan Woods, who testified that a valid tender would include the indemnity limit ($100,000) together with any defense expenses incurred to the date of tender. Woods deposition, p. 152-154. That would have been consistent with the language of the current ALTA policy, but inconsistent with the language of the N.Y.B.T.U. policy in effect in this case. In any event, even that tender was not made.

the only possible relevance of the ALTA policy form is to demonstrate that Chicago Title could have reserved its now-desired termination capability. It could have done so by using language to create an appropriate reservation in its 1966 policy. Chicago Title failed to do so. There was no reservation of any such capability in its 1966 N.Y.B.T.U. form policy issued to Kent School. The fact that Chicago Title could have utilized precise language to have defined its now-claimed objective – but did not – underscores the fundamental fairness in construing the policy in favor of Kent School. "Because we conclude that the policy language is ambiguous, the doctrine of *contra proferentem* properly is applicable. Thus, we must construe the policy in a manner that affords coverage to the insured." Israel v. State Farm Mutual Automobile Ins. Co., 259 Conn. 503, 512 (2002).

**E. RELEVANT CASE LAW**

Reading the policy as a whole, Chicago Title took on three responsibilities with respect to its insured: (1) to indemnify the loss upon the payment of damages; (2) to cure the title defects if feasible; and (3) to defend the insured in a judicial attack on its title. Costagliola v. Lawyers Title Ins. Corp., 560 A.2d 1285, 1289 (N.J. Super. 1989). In Costagliola, the Chancery Division of the New Jersey Superior Court held that a title insurer may not terminate its liability by tendering the indeminity amount of the policy. Costagliola, 560 A.2d at 1289. In the underlying suit, the Costagliolas sued their next-door neighbors, the Smiths, over a boundary line dispute. Id. at 1286. The Smiths title insurance carrier did not provide a defense and the Smiths defended the suit on their own. Id. at 1288. They did so successfully.

The Smiths then sued their title insurer for reimbursement of their defense expenses. The carrier argued that, if it were liable, its liability was limited to the $6,500 face value of the policy -- as opposed to the $7,613.50 that the Smiths claimed in defense costs. Id. at 1288. The policy provided that the insurer "shall . . . pay at its option (a) the loss or damage or (b) the amount of this policy subject to [certain provisions] . . . ." Id. at 1287 (emphasis added). The court, however, did not rely on this provision in its analysis. See Id. at 1289-90. While acknowledging this provision, the court's analysis found the duty to defend to be controlling: "The obligation is what the insured bargained for." Id. at 1289. The policy limits have "no relationship to the cost of a legitimate defense -- especially one that is successful." Id.

The reasoning of the Costagliola court holds true under the terms of the present Chicago Title Policy as well. The interplay of the promises made by Chicago Title in the Insuring Agreement and in the Defense and Prosecution of Suits section of the policy makes it clear that the indemnity policy limit does not affect Chicago Title's duty to defend the suit brought by the Schaghticoke Tribal Nation.

Further guidance can be drawn from Aetna Cas. & Sur. Co.v. Sullivan, 597 N.E. 2d 62 (Mass. 1992). Although Sullivan involved a liability policy rather than a title policy, the fundamental principles are comparable. There, the insurance carrier attempted to tender the indemnity limits and thereby abandon its defense obligation relying on the following policy language: "Our duty to settle or defend ends when we have paid the maximum limits of coverage under this policy." Id. at 63. Moreover, the carrier invoked the familiar lament that, if its tender were not upheld, "it will be required to incur litigation expenses grossly

disproportionate to the premiums paid." Id. at 156. The Sullivan court rejected both rationales and instead upheld the reasonable expectation of the policyholder in receiving a full defense. In doing so, the court did not discard the policy language advocated by the carrier but determined that it would allow for a termination of the carrier's duty to defend when its indemnity limits were paid either in settlement or in satisfaction of a judgment. Id. at 160. Only at that point, and not before, would the carrier's dual obligations of defense and indemnity be satisfied.

Even if the policy provisions could not be reconciled and there were a direct conflict, however, Connecticut courts would construe the policy "in a manner that affords coverage to the insured." Hansen v. Ohio Cas. Ins. Co., 239 Conn. 537, 548 (1996). See Imperial Cas. & Indem. Co. v. Connecticut, 246 Conn. 313, 330 (1998); See also Israel v. State Farm Mut. Auto. Ins. Co., 259 Conn. 503, 512 (2002).

In Imperial Casualty, the underlying case involved claims that various officers of the Connecticut State Police were illegally taping telephone calls made within the police barracks, and were subsequently concealing the wrongdoing. When the insured officers were sued, they looked to Imperial Casualty to provide a defense, citing the portion of the policy that covered "personal injury." Under the policy, personal injury was defined as including the "deprivation of any rights, privileges or immunities secured by the Constitution." Imperial Cas., 246 Conn. at 326. The insurance company sought a declaration that it did not have a duty to defend the officers, arguing that the portion of the policy that defines an occurrence as an accident limits coverage to unintentional activity, thereby eliminating coverage for the admittedly intentional acts at issue. Id. at 327. The

Connecticut Supreme Court, in reading the policy as a whole, noted that, on the one hand, the definition of personal injury covers various injuries which can only arise due to intentional conduct, such as false imprisonment; while, on the other hand, the definition of occurrence as "an accident" appears to limit coverage to unintentional acts. "The result is that the policy purports to provide coverage for accidental, intentional torts – torts that, of course, do not exist." Id. Because a conflict in the policy language created an ambiguity and because any ambiguity had to be resolved in favor of coverage, the Imperial Casualty Court determined that the insurance carrier was required to provide a defense for the claims in the underlying case.

In Israel v. State Farm, the Connecticut Supreme Court was presented with a certified question from the United States Court of Appeals for the Second Circuit. The Supreme Court was asked whether an umbrella coverage policy is ambiguous where it provides in various places that: (1) the umbrella coverage will not apply if the insured failed to maintain underlying coverage, (2) the umbrella coverage may not be available if underlying coverage is not maintained and (3) the insured would be responsible for the underlying limit, if underlying coverage was not maintained. Israel v. State Farm, 259 Conn. at 512. Again, the Court found that the conflicting provisions constituted an ambiguity and therefore the policy must be interpreted in favor of the policyholder. Id. at 510 and 512. The reason that an ambiguous policy must be construed against the carrier and in favor of the policyholder is derived from the doctrine of *contra proferentem*, which provides that the party that drafts an instrument can avoid ambiguity through "exactness of expression." Id. at 508-509.

If Section Five (b)(2) of the Policy Conditions here can be read as providing an escape hatch, as Chicago Title urges, it is in direct conflict with Section Two(a) of the Policy Conditions which unequivocally provides that Chicago Title must "defend the insured in all actions or proceedings founded on a claim of title or incumbrances not excepted in this policy." If that is the case, then the policy, like the Israel policy, has inconsistent provisions which must be resolved in favor of the insured.[7] As the Connecticut Supreme Court has stated, "[i]f an insurer uses language that is ambiguous, any uncertainty caused by that ambiguity will be resolved against the insurer." Hansen v. Ohio Cas. Ins. Co., 239 Conn. 537, 548 (1996). See also, Cody v. Remington Elec. Shavers, 179 Conn. 494, 497 (1980); Beach v. Middlesex Mut. Assurance Co., 205 Conn. 246, 250 (1987); Griswold v. Union Labor Life Ins. Co., 186 Conn. 507, 513 (1982).

"When the words of an insurance contract are, without violence, susceptible of two interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted." Raffel v. Travelers Indem. Co., 141 Conn. 389, 392 (1954). In this case, not only is Kent School's reading of the policy done without violence, it is more consistent with the actual words used in the policy than Chicago Title's preferred interpretation.

---

[7] The parallels to the Israel case are heightened by the reading that Chicago Title gives to Section Two(b) of the Policy Conditions. That section of the Policy permits Chicago Title to participate in actions that do not directly affect title (such as a trespass action brought by a neighbor), as a means of preventing loss under the policy. Chicago Title urges this Court to read the right granted by Section Two(b) as eroding the duty imposed by Section Two(a). Thus, under the reading urged by Chicago Title: the policy at once requires a defense (Section Two(a)), permits a defense at the insurers' option (Section Two(b)) and requires no defense after tender (Section Five(b)).

Chicago Title implies that Kent School is taking the phrase "and in addition" as used in the Insuring Agreement out of context. It argues that the phrase cannot be read to create an obligation to pay the cost of defense *ad infinitum*, and cites Zurich Ins. Co. v. Raymark Indus., Inc., 524 N.E.2d 150 (Ill. 1987) and Pareti v. Sentry Indemnity Co., 536 So. 2d 417, 421 (La. 1988) for that proposition. See Chicago Title's Memorandum in Support of Motion for Summary Judgment at 16-17. However, each of the cited cases addresses circumstances that are quite different than those before this Court.

In both Zurich and Pareti, the courts were being asked to determine whether the particular insurer's duty to defend actions survived after settlements had exhausted the indemnity limits of the policies at issue. Based on the language used in the comprehensive liability policy at issue in Zurich and the automobile policy at issue in Pareti, those courts determined that the duty to defend was exhausted once the indemnity limits of those particular policies had been exhausted either through settlements or through the payment of judgments. Neither case involved the purported tender of policy limits. Moreover, the Pareti court identified a series of cases that held that the language of older policies (at least two of which appear to involve policies of similar vintage to that at issue here) was broader and required that the insurers defend claims even after the policy's indemnity limit had been exhausted. See Pareti, 536 So. 2d 417 at fn. 5.

Other courts construing a comparable duty to defend in liability policies have held that carriers cannot escape their defense obligation by simply paying the policy limits.[8] As in Zurich and Pareti, the termination of the defense obligation can only be accomplished if the payment of the limits were applied to a judgment or a settlement.

> This principle, which we adopt, that an insurer is relieved of its duty to defend only upon exhaustion of its policy limits by settlement or judgment, seems consistent with the principle contained in the legal literature in this area.

Samply v. Integrity Ins. Co., 476 So. 2d 79 (Ala. 1985) (declining to terminate defense obligations on the basis of the policy limits being paid into court). The Samply court distinguished virtually all of the authority cited in support of the carrier's position as involving judgments or settlements.

That premise has been confirmed by the Delaware Supreme Court:

> A reasonable policy holder would expect to be defended until claims arising under the policy are resolved, either by settlement or judgment. To read the policy otherwise would be to nullify the duty to defend in

---

8 The duty to defend has universally been considered an independent obligation. Kocse v. Liberty Mutual Ins. Co., 387 A.2d 1259, 1262 (1978) ("Considerations of fairness lead to the conclusion that the obligation to defend should be considered an independent obligation"). Indeed, some courts have required the carrier to provide a defense to a second suit even though the carrier had defended and paid the indemnity limits on a prior suit. E.g., St. Paul Fire & Marine Ins. Co. v. Thompson, 433 P.2d 795 (Mont. 1967).

> "First of all, the payment of policy limits is clearly distinct and separate from the duty to defend . . .. There is no language in the policy making the defense covenant dependent on the amount of liability for bodily injury. The defense covenant is clear, positive, and unambiguous, and should be accorded its plain and ordinary meaning."

Id. at 799 (internal citations omitted).

> those situations where the insured most needs that protection. We are satisfied that our interpretation is consistent with the language of the policy, and we note that it is the prevailing interpretation in other jurisdictions.

Continental Ins. Co. v. Burr, 706 A.2d 499, 502 (Del. 1998). See also, Siligato v. Welch, 607 F. Supp. 743, 746 (D. Conn. 1985) (Dorsey, J.).

The fact that the words "judgment" and "settlement" may not be included in the policy's termination of liability provision is not controlling. Indeed, in Douglas v. Kelly, the court considered a policy whose prior iteration had included express references to "judgment" or "settlement" but where the policy in issue had no such express reference. Douglas v. Kelly, 727 N.E. 2d 376 (Ill. 2000). While the court referenced the change in language, it considered the duty to defend to be so important that "the absence of the language here is not fatal to the insured's case because the relevant provision is ambiguous and such ambiguity must be construed in the insured's favor." Id. at 383. In reaching that determination, the Douglas court underscored the importance of the duty to defend by positing the cavalier unfairness of a contrary result.

> There are strong public policy arguments against allowing insurers to discharge their duty to defend by paying policy limits and then leaving the insured to fend for himself. "A most significant protection afforded by the policy - - that of defense - - is rendered a near nullity" if the duty to defend would terminate upon unilateral tender of policy limits. . . . "'The insurer's duty is both to defend actions and to pay judgment against the insured. Otherwise where the damages exceed the policy coverage, the insurer could walk into court, toss the amount of the policy on the table, and blithely inform the insured that the rest was up to him. This would obviously constitute a breach of the insurer's contract to defend actions against the insured, for which premiums had been paid, and should not be tolerated by the courts.'"

Id. at 383. (internal citations omitted).

Chicago Title's attempt to "toss the amount of the policy on the table" is particularly troubling here because there is no judgment; there is no settlement; there is no change of circumstance. Instead, Chicago Title has simply changed its mind. That, however, does not change its obligation to provide Kent School with a full defense.

### F. THE INAPPLICABILITY OF THE BATDORF CASE

Chicago Title relies heavily on a case decided by an intermediate appellate court in the State of Washington. Batdorf v. Transamerica Title Ins. Co., 702 P.2d 1211 (Wash. 1985). It does so in an effort to garner support for its argument that Section Five(b) of the Policy Conditions provides an escape hatch. However, the policy language at issue in Batdorf is very different from the policy language here. So much so, in fact, that Batdorf should simply serve as a lesson that the Title Insurance industry knows how to craft escape hatches, but that Chicago Title failed to include one within the policy that it sold to Kent School.

The policy section at issue in the Batdorf case was the duty to defend provision itself. That very provision contained an express reservation:

> The Company shall have the right to, and will, at its own expense, defend the Insured with respect to all demands and legal proceedings founded upon a claim of title, encumbrance or defect which existed or is claimed to have existed prior to the date hereof and is not set forth or excepted herein; *reserving however, the option at any time of settling the claim or paying the amount of this policy in full.*

Id. at 1213 (Italics provided by the Batdorf court). By way of contrast, the Chicago Title duty to defend provision consists of a simple declarative sentence:

> The Company [Chicago Title] will, at its own cost, defend the insured in all actions or proceedings founded on a claim of title or incumbrances not excepted in this policy.

Policy Conditions at Section Two(a). Unlike Batdorf, there is no reservation whatsoever as to Chicago Title's duty to defend.

Put another way, Chicago Title's policy simply does not provide the same option that the Batdorf policy provided. If an insurer intends to delimit its duty to defend, it must clearly state that limitation. United States v. United States Fidelity & Guar. Co., 601 F.2d 1136, 1141 (10th Cir. 1979) (addressing issue of whether policy exclusions cover the duty to defend as well as the duty to indemnify).

Chicago Title also cites the Ruger case from the Delaware Superior Court with respect to its claim that the policy provides options as to how the insurer is permitted to respond to a claim. See Chicago Title Memorandum at 11-12 discussing Ruger v. Funk, 1996 Del. Super. LEXIS 34 (Jan. 26, 1996). However, the Ruger decision provides no support under the factual circumstances involved here. Ruger did not involve a duty to defend at all. There, the State was attempting to condemn a portion of the insured's property, and was asserting that the insured held only an easement or right of way over portions of the property rather than a fee simple interest (presumably, to reduce the amount of compensation due to the insured). The insurance carrier chose to exercise its right to tender the policy limits, rather than to initiate a quiet title action. Because the Ruger case does not involve a suit brought to challenge the title of the insured parcel, it cannot stand for the proposition that the policy may be tendered as a means of resolving the duty to defend.

## III. CHICAGO TITLE HAS WAIVED ANY RIGHT TO ABANDON THE DEFENSE AND IS ESTOPPED FROM DOING SO

Even if Section Five(b) could reasonably be read to provide Chicago Title with a right to terminate its defense obligation by tendering the $100,000 indemnity limit, it has waived, or alternatively is estopped from asserting, that right by providing a defense to the claims brought by the Schaghticoke Tribal Nation beginning in 1977. See S.H.V.C., Inc. v. Roy, 188 Conn. 503, 510 (1982)(implied waivers and estoppels by conduct are so similar that they are nearly indistinguishable).

Chicago Title has satisfied the waiver criteria by engaging in conduct that might reasonably be found to have constituted an intentional relinquishment of a known right. Olean v. Treglia, 190 Conn. 756, 772 (1983). "Waiver does not have to be express, but may consist of acts or conduct from which waiver may be implied." Novella v. Hartford Acc. & Indemnity Co., 163 Conn. 552, 562 (1972).

When notified of the initial Schaghticoke suit in 1977, Chicago Title accepted its defense obligation as to the insured parcel "without reservation." See May 10, 1977 letter from Lawrence Kuder, Chicago Title, to Mr. Richard Rockwell, Day, Berry & Howard, appended to Elliott Affidavit at ¶ 4. When notified of the revived Schaghticoke suit in 1998, Chicago Title again accepted its defense obligation. Chicago Title did not assert a reservation of rights. Elliott Aff. at ¶ 7.[9]

A leading treatise notes that "[g]enerally, the insurer will be held to have waived or

---

9 Apparently because of confusion within Chicago Title, it took until February 15, 2001 for Chicago Title to accept the defense for the revised suit. Sussman Aff. at ¶ 6.

to be estopped from asserting a ground for denying coverage other than that set forth in the non-waiver agreement or the reservation of rights letter." 2 Holmes' Appleman on Insurance 2d § 136.7 (2003). In this case, it was only after some 24 years had passed that Chicago Title first raised any issue as to the avoidance of its duty to defend Kent School from the claims of the Schaghticoke Tribal Nation. That is simply too late.

In addition to Chicago Title's waiver, the doctrine of estoppel precludes its termination attempt at this late date. Griggs v. Bertram, 443 A.2d 163 (N.J. 1982). Chicago Title has undertaken the defense, and Kent School has relied on that undertaking. Chicago Title tries to argue that Kent School would not be prejudiced by Chicago Title's abandoning the defense at this late date in exchange for its tender of $100,000.

Chicago Title is wrong for the fundamental reason that $100,000 today is not the same as $100,000 in 1977. First, if Chicago Title had tendered timely in 1977, Kent School may have been able to purchase property to replace a substantial part of that which is the subject to the Schaghticoke claim. However, between 1977 and 2001 building lots in the Town of Kent appreciated by some 500%, on average. Affidavit of David L. Bain at ¶ 6. Thus, $100,000 today would not come nearly as close to making Kent School whole as it might have had that amount been tendered in 1977. Second, if Chicago Title had tendered timely in 1977, the underlying case may have been capable of being settled for the tendered amount. It is entirely possible that the Schaghticoke Tribal Nation would have accepted $100,000 to settle the claim in the pre-casino days of the late 1970s. It is impossible to confirm either of these opportunities because we cannot turn back the clock. It is a dilemma entirely created by Chicago Title. See Collins v. Grange Mut. Ins. Co., 706 N.E. 2d 856

(Ohio 1997)(finding that the insurer could have avoided the potential of prejudice by clearly preserving its right to contest coverage within a reasonable time). For this reason, courts have found a presumption of prejudice where insurance carriers have changed their position on coverage issues. See Bouchard v. Travelers Indem. Co., 28 Conn. Supp. 122, 125 (Conn. Super. 1969)(Rubinow, J.).

> In freely applying the doctrines of waiver and estoppel in suits on insurance policies, the courts are merely recognizing that the parties to an insurance policy do not negotiate the contract at arm's length; that the coverage must be purchased in the form submitted without change; that there is no "meeting of the minds" on the policy provisions; and that policies are usually purchased by people who, as the insurer knows, do not subject the policy to scrutiny but have only "reasonable expectations" concerning the coverage to be afforded them by the policy.

Id., at 125, 126 (internal citations omitted).

Simply put, Chicago Title now claims that it has a clear right under the policy to abandon coverage simply by tendering the $100,000 amount of insurance. However, Chicago Title has known about this claimed "clear" right for the entire two-plus decades of the underlying litigation, and yet it failed to take any steps to exercise the claimed right until October of 2001. By failing to take any steps to preserve its position under Section Five(b) of the Policy Conditions prior to that time, Chicago Title has both waived, and is estopped from exercising, any such right that the policy may have otherwise afforded.

Griggs v. Bertram, 443 A.2d 163 (N.J. 1982) is instructive on this point. In Griggs, the insured was a juvenile who was involved in a fistfight at a school basketball game. After the fight, the insured notified his carrier of the potential claim and, as part of an interview with the insurer admitted that he had punched the other student. Shortly thereafter, the other student made a claim, which was forwarded to the insurance carrier. No additional action

was taken by anyone for approximately seventeen months, at which point the second student initiated a lawsuit. The policyholder dutifully forwarded a copy of the complaint to his carrier, who denied the claim, relying on an exclusion for intentional torts. The New Jersey Supreme Court held that the carrier was estopped from denying coverage based on its failure to assert its position in a timely fashion. Id. The court noted that where the carrier has not disclaimed coverage,

> an insured who cannot take any meaningful steps toward an early settlement of the claim without risking loss of coverage pursuant to the provision prohibiting it from voluntarily or independently settling the claim. Further, an insured who undertakes its own investigation of the incident or endeavors to prepare a defense to a claim can potentially interfere with the insurer's paramount right to control the case and may thereby be exposed to a later charge by the insurer of a breach of the policy provisions regarding the duty to cooperate.

Id. at 170 (internal citations omitted). Accord, Safeco Ins. Co. v. Longhouse, 725 P.2d 217 (Mont. 1986)(insurer estopped from relying on completed operations exclusion 18 months after it accepted coverage); Transamerica Ins. Group v. Chubb, 554 P.2d 1080 (Wash. 1976)(insurer estopped from denying coverage after defending without reservation of rights for a period of ten months).

With respect to the litigation involving Kent School and the Schaghticoke Tribal Nation, the insurance company's failure to reserve its rights did not merely continue for a period of some 10 or 18 months. Instead, Chicago Title provided a defense without a reservation of rights for some 24 years. See May 10, 1977 letter from Lawrence Kuder, Chicago Title, to Mr. Richard Rockwell, Day, Berry & Howard LLP appended to Elliott Aff. at ¶ 4. Since the parties at this point in time cannot go back and reevaluate the underlying case in light of Chicago Title's newly held position, Chicago Title must be

deemed to have waived its claimed right to tender the policy limits and be estopped from abandoning its defense obligations to Kent School.

## IV. EVEN IF THE DUTY TO DEFEND IS TERMINATED, CHICAGO TITLE IS NOT ENTITLED TO REIMBURSEMENT OF THE DEFENSE COSTS

Chicago Title cites Security Ins. Co. v. Lumbermen's Mut. Cas. Co., 264 Conn. 688 (2003) for the proposition that Kent School should be ordered to reimburse the defense costs that have been paid since Chicago Title purported to tender the indemnity limits. See Chicago Title Memorandum at 20-23. However, neither Security Insurance nor any other tenet of insurance law provides for such reimbursement under the circumstances before this Court.

In Security Insurance, the Connecticut Supreme Court was addressing allocation of defense costs related to comprehensive general liability coverage for asbestos litigation over an exposure period of some forty-five (45) years. The portion of the Security Insurance decision upon which Chicago Title relies addressed the question of whether or not the policyholder should be required to reimburse its insurance carriers for periods in which it was self-insured. Security Ins., 264 Conn. at 715-717. That self insurance resulted in part from the fact that the policyholder had settled with certain carriers and received the financial benefit from that settlement. The Security Insurance Court reasoned that under the pro rata allocation scheme that it approved in that case, the policyholder would receive a windfall if the insurance companies were not able to recover defense costs that they expended for periods in which the insured had either settled favorably or decided not to purchase coverage. Id.

Here, however, there is no chance that Kent School will receive a windfall. Moreover, Kent School was not self insured for any period; there were no other carriers. Sides Aff. at ¶ 13. As set forth in considerable detail above, the terms of the Policy that Chicago Title sold to Kent School covers the defense of the Schaghticoke litigation. Chicago Title admitted as much when it accepted the defense of the underlying litigation, without reservation, in 1977. See May 10, 1977 letter from Lawrence Kuder, Chicago Title, to Mr. Richard Rockwell, Day, Berry & Howard, appended to Elliott Aff. at ¶ 4. Moreover, a portion of the fee that Kent School paid was in consideration of Chicago Title's examination of the very title that it agreed to defend. See Insuring Agreement.

Where an insurance carrier undertakes a defense under the contract of insurance, it does so as much for its own benefit as for that of the policyholder. Terra Nova Ins. Co. v. 900 Bar, Inc., 887 F.2d 1213, 1220 (3rd Cir. 1989). Thus, there can be no windfall in Kent School's favor based on its acceptance of Chicago Title's decision to perform its contractual duties.

Moreover, even if there were a question about the duty to defend, the very cases that Chicago Title cites as supporting its claim for reimbursement undermine that claim. For example, Chicago Title cites Buss v. Superior Court, 16 Cal. 4th 35 (1997) as follows: "The court, considering a general liability policy, held that an insurer has a right to reimbursement for costs solely allocable to non-covered claims only if the insurer specifically reserved its right to seek reimbursement of defense costs at or before the time it provided a defense. Buss, 939 P.2d at 776." Chicago Title Memorandum at 20 (emphasis added). In this case, it is undisputed that Chicago Title accepted the defense of the underlying litigation, without

reservation, in 1977. See May 10, 1977 letter from Lawrence Kuder, Chicago Title, to Mr. Richard Rockwell, Day, Berry & Howard, appended to Elliott Aff. at ¶ 4. Chicago Title again accepted the defense without reservation when the Schaghticoke litigation was revived. Sussman Aff. at ¶ 6. Thus, Buss cannot apply.

Similarly, in the United National case, cited by Chicago Title at Page 21 of its brief, the court indicated that, in order to claim the right to reimbursement, the insurance carrier was required to show that the parties intended to agree that the carrier would be able to recoup costs if it was later determined that the carrier had no duty to pay. United National Ins. Co. v. SST Fitness Corp., 309 F.3d 914, 920 (6th Cir. 2002). The basis for the court's decision was the theory of implied in fact contract. Essentially, because the carrier made a timely reservation of rights, and the policyholder subsequently accepted payments, the court found that the a new contract permitting recovery was formed by the parties. Id. at 921. The Colony Insurance case is even more explicit about the contractual nature of the right of reimbursement, citing the Restatement (Second) of Contracts for the proposition that a party cannot accept tendered performance from the other party to a contract, while unilaterally altering the material terms on which it is offered. Colony Ins. Co. v. G&E Tires & Serv., Inc., 777 So. 2d 1034, 1039 (Fla. Ct. App. 2000).

Under the circumstances before this Court, however, the implied in fact contract theory fails. When Chicago Title tendered its performance under the contract, it did so unconditionally as to the parcel at issue. See May 10, 1977 letter from Lawrence Kuder, Chicago Title, to Mr. Richard Rockwell, Day, Berry & Howard, appended to Elliott Aff. at ¶ 4. Thus, in 2001, when Chicago Title decided that it wanted to alter the terms of its

performance of the contract it did so unilaterally, and any attempt to create a new, implied in fact, contract must fail for lack of consideration.

## V. CHICAGO TITLE IS NOT ENTITLED TO SUMMARY JUDGMENT AS THE FACTUAL BASIS OF THE ALLEGED TENDER IS IN DISPUTE

Chicago Title alleges that it "attempted to tender" the "policy limit of $100,000" to Kent School on October 2, 2001. See Chicago Title Local Rule 56(a)(1) Statement at Para. 4. However, this allegation is disputed on three levels. First, as set forth above, the contractual reference is for tendering "the full amount of this policy," not the $100,000 in indemnity coverage. See discussion at pages 11-12, supra.

Second, according to the deposition testimony of Attorney Susan Woods, the Senior Vice President and National Advisory Counsel for Chicago Title, even a tender of $100,000 would not have been sufficient. From Chicago Title's perspective a valid tender would have involved $100,000 "[t]ogether with any reasonable approved expenses to date." Woods deposition, p. 152. Relevant portions of Woods's deposition testimony are attached hereto as Exhibit 4.

Third, there is a dispute as to whether Chicago Title's "attempt to tender" is an actual tender as would be required under its reading of the policy. According to the affidavit of Attorney Susan Woods, she and David Elliott as counsel for Kent School had a "discussion of the tendering of the policy limits." Woods Aff. at ¶ 6. Subsequently, Lawrence Heffernan, acting as counsel for Chicago Title, wrote to David Elliott and informed him that "Chicago Title was prepared to tender the policy limits to Kent School." Id. at ¶ 7 (emphasis added).

However, neither discussions about the possibility of tendering the policy, nor preparations for tender are the same as tender. The rules that govern tender are strictly construed, and strictly applied such that the tenderer must do and offer everything in its power to ensure that the offer is unconditional and unambiguous. Nguyen v. Calhoun, 105 Cal. App. 4th 428, 129 Cal.Rptr. 2d 436, 439 (2003). Here, Chicago Title never made an unconditional, unambiguous offer of even the $100,000 indemnity amount of the policy. Woods Deposition, p. 111.

In response to the inquiries that Chicago Title made about its interest in buying out Kent School's rights under the policy, Attorney Elliott informed Chicago Title that the School believed that the terms of the policy simply did not permit Chicago Title to withdraw its defense through the payment of the indemnity amount of the policy. Elliott Aff. at ¶ 9. However, at no time did Chicago Title actually tender anything, not even the $100,000 indemnity amount of the policy. Id. At the very least, there is a fundamental factual dispute as to whether or not Chicago Title has ever tendered anything to Kent School. Accordingly, Chicago Title cannot prevail on its Motion for Summary Judgment.

## CONCLUSION

For the foregoing reasons, Chicago Title's Motion for Summary Judgment should be denied, and Kent School's Cross Motion for Summary Judgment should be granted.

DEFENDANT - THE KENT SCHOOL CORPORATION

By: /s/ Francis J. Brady
Francis J. Brady - ct04296
Michael J. Donnelly - ct07974

Murtha Cullina LLP
CityPlace I - 185 Asylum Street
Hartford, Connecticut 06103-3469
Telephone: (860) 240-6000
Facsimile: (860) 240-6150
Its Attorneys

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Defendant The Kent School Corporation's Memorandum In Opposition To Chicago Title's Motion For Summary Judgment and In Support Of Cross-Motion For Summary Judgment was mailed first-class, postage prepaid, on this 21st day of May, 2004 to:

Frank P. Coulom, Jr., Esq.
Marion Manzo, Esq.
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-34597

Lawrence Heffernan, Esq.
Robinson & Cole LLP
One Boston Place
Boston, Massachusetts 02108-4404

/s/ Michael J. Donnelly
Michael J. Donnelly